

FILED
JUL 25 2014
USDC WP SDNY

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J. SCOTT NICHOLSON, on behalf of himself and all others similarly situated,<br><br>                 Plaintiff,<br><br>        - against –<br><br>THE BANK OF NOVA SCOTIA, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC BANK U.S.A. N.A., AND JOHN DOE NOS. 1-50,<br><br>                 Defendants. | Docket No.<br><br>ECF Case<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

14 CV 5682

J. Scott Nicholson ("Plaintiff") complains, upon knowledge as to himself and his own acts, and upon information and belief as to all matters against Defendants (defined at ¶¶ 23-27), as follows:

## NATURE OF THE ACTION

1.      This action arises from the unlawful combination, agreement and conspiracy between three of the world's largest silver bullion banks, Bank of Nova Scotia, Deutsche, and HSBC, and their unnamed co-conspirators John Does 1-50 (collectively "Defendants") to intentionally manipulate the price of physical silver and silver derivatives, including COMEX silver futures contracts, for their collective benefit during the period of at least January 1, 2007, through the present ("Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. § 1, et seq. (the "CEA"), and the Sherman Antitrust Act, 15 U.S.C. § 1, et seq. ("Sherman Act").

2.      The Defendants are in the unique position of holding seats on a panel that determines the market price of physical silver.

1

3.     Every business day, beginning at 12:00 P.M. London time, the Defendants meet on a secure conference call to exchange pricing information that is intended to reflect the supply and demand of silver in the London market.

4.     This conference call, known as the London Silver Fixing (hereinafter "Silver Fixing" or "Fix") establishes the price for silver through a "Walrasian" or simultaneous auction. During the auction, Defendants examine their current silver orders and disclose how much silver they would be willing to buy or sell at a given price.  The price is then adjusted until the total amount of silver willing to be bought and sold by the Defendants at the specified price is roughly equal.  At that point the price of silver is "fixed" and the resulting price is published to the market.

5.     The importance of the Silver Fixing cannot be overstated.  Investors and silver market participants throughout the world use the result of the Silver Fixing to price billions of dollars in physical silver and silver derivatives, including COMEX silver futures contracts, each trading day.  With the value of so many transactions linked to the Silver Fixing, even small changes in the Silver Fixing result in millions of dollars in gains or losses for silver market participants, including COMEX silver futures traders.

6.     Despite the importance of the Silver Fixing and its impact on the silver market as a whole, the entire process takes place in secrecy.  The daily conference calls are completely private.  There are no records of what is said on these daily conference calls and there is no regulatory oversight of the Silver Fixing.  No one is allowed to observe the auction process or verify the price information submitted by Defendants during the auction, which ultimately determines the new global market price for physical silver.  This extreme level of secrecy creates an environment that is ripe for manipulation.

7.     Defendants have a strong financial incentive to use the secretive Silver Fixing process to their advantage.  Just as there is no regulatory oversight of the Silver Fixing, there are no restrictions on Defendants' trading activity.  Even though Defendants are responsible for fixing the market price of physical silver for the entire world, they are allowed to trade both physical silver and silver derivatives freely - before, during, and after the Silver Fixing.  With complete control over where the price of silver will be fixed, Defendants have a strong financial incentive to establish positions in both physical silver and silver derivatives prior to the public release of Silver Fixing results, allowing them to reap large illegitimate profits.

8.     Throughout the Class Period, the Defendants abused and exploited their position of exclusive control over the Silver Fixing by intentionally manipulating the price of physical silver and the prices of silver derivatives, including COMEX silver futures contracts, to artificial levels.  This manipulative conduct benefited Defendants' proprietary trading positions but harmed Plaintiff and other class members.

9.     Defendants' manipulative conduct resulted in hundreds of millions (if not billions) of dollars in illegitimate profits for the Defendants and/or their co-conspirators by artificially increasing the value of their positions in physical silver and/or silver derivatives, including COMEX silver futures contracts.

10.     Defendants acted in concert using numerous means to illegitimately increase their profits including (i) manipulating the price of silver by knowingly submitting false pricing information during the Silver Fixing that did not accurately reflect the amount of supply and demand in the silver market; and (ii) using their advance, inside knowledge of the Fix price to establish silver market positions, including positions in COMEX silver futures contracts, that would increase in value once the results of the Silver Fixing were released to the market.

3

11.     Defendants' manipulative conduct has been confirmed by Plaintiff's own economic analysis, which has uncovered anomalous changes in the price and trading volume of COMEX silver futures contracts consistently occurring within minutes of the start of the Silver Fixing.

12.     These price and volume changes, which occur before the results of the Silver Fixing are released to the public, consistently predict whether the price of silver will be fixed higher or lower than it was at the start of the Silver Fixing.  As a result, these price and volume anomalies are best and most plausibly explained by trading activity by market participants with advance knowledge of the Silver Fixing results, rather than legitimate changes in supply and demand fundamentals and/or trading activity by uninformed market participants.[1]

13.     Defendants' conduct has attracted the attention of several international financial regulatory bodies.  It has been publicly revealed that the U.S. Commodity Futures Trading Commission, the U.K. Financial Conduct Authority, and the German Federal Financial Supervisory Authority, a/k/a BaFin, are all currently investigating the Silver Fixing process.

14.     In response to these investigations and regulatory scrutiny, Defendant Deutsche Bank announced on January 17, 2014, that it was withdrawing from the Silver Fixing.  The London Silver Market Fixing Ltd., the entity that administers the Silver Fixing, announced on May 14, 2014, that as a result of Deutsche Bank's withdrawal, the Silver Fixing will end on August 14, 2014.

---

[1] A similar analysis conducted for the trading activity around the London Gold Fixing, which fixes the price of gold, found statistically significant price and volume increases within the five minutes following the start of the Gold Fixing.  These price and volume changes consistently generated increased returns for traders with directional insight into where the price of gold would be fixed relative to the price of COMEX gold futures contracts. *See* Andrew Caminschi & Richard Heaney, *Fixing A Leaky Fixing: Short-Term Market Reactions To The London PM Gold Price Fixing*, in J. FUTURES MKT. 1, 16 (2013) (hereinafter, "*Leaky Fixing*").

15.     As a direct result of Defendants' unlawful conduct, Plaintiff and the Class unknowingly transacted in a manipulated and artificial COMEX silver futures market.  Plaintiff believes that further evidentiary support for the claims alleged herein will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

16.     This action arises under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively.

17.     Silver is a "commodity" and is the "commodity underlying" silver futures contracts traded on the COMEX as defined and used in Sections 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

18.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337, respectively.

19.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

20.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

21.     Silver and silver derivatives contracts, like COMEX silver futures contracts, are commodities that trade in interstate commerce.  Defendants' restraint of trade and intentional manipulation of silver and silver derivatives prices had direct, substantial and foreseeable effects in the United States and on Plaintiff and members of the Class.  Billions of dollars of silver and silver derivatives were traded in the United States during the Class Period.  Defendants, as Silver Fixing Members and sophisticated market participants, knew the results of the Silver Fixing are (and were during the Class Period) disseminated in the United States, and are (and were during the Class Period) used to price silver and silver derivatives, including COMEX silver futures contracts.  For these reasons, Defendants knew that manipulating the Silver Fixing, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of silver derivatives such as COMEX silver futures contracts.

## PARTIES

22.     Plaintiff J. Scott Nicholson, a natural person residing in Washington, purchased and/or sold COMEX silver futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Plaintiff was deprived of transacting in a lawful, non-manipulated competitive market in silver futures contracts and suffered legal injury as a direct and proximate result of Defendants' unlawful conduct.

23.     Defendant The Bank of Nova Scotia is a Canadian public company with its principal place of business located at 44 King Street West, Toronto, Ontario Canada M5H 1H1 with branches and/or offices in this District.  ScotiaMocatta is a division of The Bank of Nova Scotia and part of the Scotiabank Global Banking and Markets segment.  ScotiaMocatta is a global leader in precious and base metals trading, finance and physical metal distribution

providing services to its worldwide client base. The Bank of Nova Scotia and its subsidiaries or affiliates, including ScotiaMocatta, are collectively referred to herein as the "Bank of Nova Scotia." During the Class Period, Bank of Nova Scotia was a member of the London Silver Market Fixing Ltd. and participated in the daily Silver Fixing.

24.     Defendant Deutsche Bank AG ("Deutsche") is a German financial services company headquartered in Frankfurt, Germany. Deutsche maintains branches and/or offices in this District. During the Class Period, Deutsche was a member of the London Silver Market Fixing Ltd. and participated in the daily Silver Fixing.

25.     Defendant HSBC Holdings PLC ("HSBC") is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank PLC is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England with branches and/or offices in this District. Defendant HSBC Bank U.S.A., N.A. is a federally chartered banking corporation headquartered in McLean, Virginia and is a subsidiary of HSBC Holdings PLC. HSBC Holdings PLC, HSBC Bank PLC and HSBC Bank U.S.A., N.A. are collectively referred to herein as "HSBC." During the Class Period, HSBC was a member of the London Silver Market Fixing Ltd. and participated in the daily Silver Fixing.

26.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, interdealer brokers, cash brokers and other co-conspirators whose identities are currently unknown to Plaintiff. The John Doe Defendants participated in, further, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the Silver Fixing.

27.     Defendants Bank of Nova Scotia, Deutsche Bank and HSBC are referred to collectively herein as "Defendants" or "Silver Fixing Members."

7

28.     During the Class Period, Defendants, either directly or through their subsidiaries or affiliates engaged in for-profit trading of silver and silver derivatives, including COMEX silver futures, which were traded and/or valued based on the Silver Fixing.

## AGENTS AND UNNAMED CO-CONSPIRATORS

29.     Various other entities and individuals, including, but not limited to, subsidiaries and/or affiliates of Defendants participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the Silver Fixing and prices of silver derivatives, including COMEX silver futures contract prices.

## SUBSTANTIVE ALLEGATIONS

I.     **BACKGROUND**

A. **The Silver Fixing**

30.     The market for physical silver is a large, opaque, fragmented, 24-hour, over-the-counter market.  Unlike a modern exchange, where prices are established universally based on market activity, there is no centralized market for physical silver.  Without a centralized market for trading physical silver there can be no centralized price.

31.     The Silver Fixing was established to fix this problem by setting the price of physical silver at a regular time each trading day.  The goal was to improve transparency by providing buyers and sellers in the physical silver market with a fixed price instead of requiring them to rely on quotes offered by various silver dealers.

32.     The Silver Fixing began in 1897.  The original members of the Silver Fixing included: (i) Mocatta & Goldsmid; (ii) Sharps & Wilkins; (iii) Pixley & Abell; and (iv) Samuel Montagu & Co.

33.     The Silver Fixing is now administered by the London Silver Market Fixing Ltd. Each business day during the Class Period the Silver Fixing Members (1) Bank of Nova Scotia; (2) Deutsche and (3) HSBC, meet on a secure conference call at 12:00 pm London Time to fix the price of physical silver.

34.     The Silver Fixing, which typically takes 10 to 15 minutes, is conducted as a "Walrasian" or simultaneous auction lead by one of the Silver Fixing Members who is designated as the "Chairman."  The Chairman position rotates among the Silver Fixing Members each year.

35.     The Silver Fixing starts with the Chairman's determination of what is considered to be the U.S. Dollar "spot price" or current market price of silver in the London market.  This is the opening price for the auction.

36.     The Silver Fixing Members then begin trading at the opening price.  Each Silver Fixing Member examines its order book, which contains order from clients' brokerage accounts along with proprietary orders from that Silver Fixing Member's own trading desk.  Based on those orders each of the Silver Fixing Members then declare how many bars of silver (around 1,000 troy ounces each) they would be willing to buy or sell at the opening price in 50 bar increments.

37.     After each participant places their orders, the transactions are netted against each other.  If the amount of buying interest is equal to the amount of selling interest the Silver Fixing is complete.  Otherwise the Chairman will adjust the price up or down and the process will be

repeated until the total amount of silver bought is within 300 bars of the total amount sold. For

example, if at the opening price the Silver Fixing Members express interest in buying at total of

1000 bars of silver but only 300 bars are offered for sale, the Chairman will progressively raise

the price, inducing the sellers to offer more silver, until the difference between the buyers and

sellers is 300 bars or less.

38.     If for some reason this 300 bar threshold cannot be reached, the Chairman can

unilaterally fix the price of silver and the Silver Fixing Members will divide the excess supply or

demand pro-rata among themselves. For example, if there is one buyer and two sellers and the

buyer is willing to purchase 300 bars more than what is being offered, the buyer will reduce their

buying interest by 100 bars and each of the sellers will increase their selling interest by 100 bars,

absorbing the 300 bar difference.

39.     Once the Silver Fixing process is completed, the final price is published to the

market. This price is used as the spot price for silver worldwide.

**B.  <u>Silver Derivatives</u>**

40.     The Silver Fixing directly affects all contracts or financial instruments whose

value is derived from the price of silver. This includes silver derivatives contracts, like COMEX

silver futures contracts.

41.     In the United States, most silver futures contracts are traded on COMEX, short for

Commodity Exchange, Inc., which is a division of the New York Mercantile Exchange.

COMEX is a Designated Contract Market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.

42.     COMEX, as a contract market designated by the U.S. Commodity Futures

Trading Commission ("CFTC"), submits to the CFTC for approval various rules and regulations

that are the basis for how COMEX standardizes the contracts that trade on its exchange as well as how it administers the actual trading and settlement of those contracts.

43.     A standard COMEX silver futures contract is an agreement to buy or sell a fixed amount of silver, generally 5,000 troy ounces, at a specified date in the future.  The price of each contract is quoted in United States Dollars per troy ounce, for example a contract price of $20 represents an agreement to buy or sell silver at $20 per troy ounce on some future date.

44.     The "notional value," what the contract is actually worth, is much higher than the quoted price.  Because each COMEX silver futures contract is an agreement to buy or sell 5,000 troy ounces of silver, the notional value of a contract with a price of $20 is really $100,000 or the agreed to price per ounce of silver multiplied by 5,000 troy ounces.

45.     COMEX specifies the terms of trading for silver futures contracts, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

46.     COMEX also specifies the months in which silver contracts will be available. According to COMEX rules, during each calendar month, contracts that provide for delivery of silver in the following months will be available: (1) the current calendar month; (2) the next two calendar months; (3) any January, March, May, and September falling within a 23-month period; and (4) any July and December falling within a 60-month period beginning with the current month.

47.     While COMEX silver futures contracts can exist for every month of the year, not all contracts are traded with the same frequency.  Contracts for certain months are more heavily traded than others.  Generally, the March, May, July, September and December contracts are the

11

most heavily traded.  There is substantially less trading volume in contracts for the remaining months.

48.     A COMEX silver futures contract trades until the third to last business day of the contract month.  For example, if the last business day of May 2014 is Friday, May 30, a May 2014 COMEX silver futures contract will trade until Wednesday, May 28, 2014.

49.     Trading occurs both electronically and in person until the last trading day.  As COMEX is a member of the CME, COMEX silver futures contracts are traded on the CME Globex and CME ClearPort electronic trading platforms as well as in open outcry auctions on the floor of the New York Mercantile Exchange.

50.     Because a futures contract represents a bilateral agreement, there are always two sides or positions for the related transaction.  These positions are equivalent to that of buyer and seller.  The person or entity that is buying the futures contract has what is called a "long" position.  The one selling the contract has a "short" position.

51.     Those in the long and short positions have different roles as the futures contract nears expiration, or the last trading day for that specific contract.  Longs (as the buyers of the contract) are obligated to take delivery of the underlying commodity, in this case silver, while shorts (as the sellers) are required to make delivery of the amount of silver represented by their contracts.

52.     This process of exchanging metals between buyer and seller is called "settlement."  All futures contracts are settled following their expiration, however, in most cases this does not result in an exchange of the physical commodity.  Market participants have the option to offset or "financially settle" their futures positions.  In financial settlement, instead of taking or making delivery of the physical commodity, investors in either the long or short

12

position can offset their obligations with contracts for an equal but opposite position.  For example, as a purchaser of a silver futures contract who is long can settle their obligation to take delivery of physical silver by selling an offsetting short futures contract for the same amount of physical silver.

53.     The difference between the two contract prices, for example the difference between the price at which the initial contract was purchased and the price at which the later offsetting contract was sold, is the profit or loss to the trader.  Traders with long positions, as buyers of the underlying commodity, benefit as the price of the commodity rises since they are able to sell an offsetting short contract at a higher price.  Those with short positions, as sellers of the underlying commodity, benefit as the price of the commodity decreases as they are able to buy an offsetting long contract at a lower price.

## II.     DEFENDANTS EXPLOITED AND BREACHED THEIR POSITION OF TRUST AS SILVER FIXING MEMBERS BY ENGAGING IN MANIPULATIVE AND COLLUSIVE CONDUCT THAT CAUSED ARTIFICIAL SILVER PRICES

54.     The nature of the Silver Fixing creates an environment that is highly susceptible to manipulation and collusion.  Every business day, the Silver Fixing Members meet alone on a secure conference call.  The call itself is completely secret.  There are no outside observers, and no recordings of the Silver Fixing have ever been released.  There is no regulatory body that oversees the auction process or verifies the data submitted by Defendants during the Silver Fixing.  In truth, no one except for the Silver Fixing Members know exactly what occurs on the conference call.

55.     Defendants used this extreme level of secrecy to their advantage to manipulate the price of silver and the price of silver derivatives, including COMEX silver futures contracts, to benefit their proprietary trading positions.

13



**FIGURE 1**

COMEX Silver Futures Closing Price vs. London Silver Fixing

A. **The Silver Fixing Directly Impacts the Price of Silver Derivatives**

56.     The price of COMEX silver futures contracts is directly linked to the daily results of the Silver Fixing.  Figure 1 (above) displays the daily closing price of COMEX silver futures contracts and the results of the Silver Fixing from January 2004 through December 2013.  As displayed in Figure 1, over this 10 year period, the price of COMEX silver futures contracts, represented by the dotted line, tracks the results of the Silver Fixing.

57.     Plaintiff confirmed the relationship between COMEX silver futures contracts and the Silver Fixing observed in Figure 1 by using a regression analysis.  A regression analysis is a statistical tool that is used to evaluate the relationship between two variables.  Comparing the daily closing price of the active COMEX silver futures, *i.e.*, the contract closest to expiration, to the results of that day's Silver Fixing, showed a statistically significant relationship between the price of COMEX silver futures contracts and the results of the Silver Fixing.   The regression analysis produced an $R^2$ value of .9985, indicating that 99.85% of the variation in the price of COMEX silver futures contracts over the 10 year period displayed in Figure 1 was explained by the results of the Silver Fixing.

B. **Defendants Abused Their Positions as Silver Fixing Members By Manipulating the Silver Fixing to Levels That Did Not Reflect the Legitimate Supply and Demand for Silver**

58.     Defendants, as sophisticated market participants, were aware of the impact that the Silver Fixing had on the price of silver and silver derivatives such as COMEX silver futures contracts.

59.     The Defendants, as Silver Fixing Members responsible for establishing the spot price of silver worldwide, had a duty to conduct the Silver Fixing in such a way that the resulting price of silver reflected legitimate supply and demand fundamentals.  Instead, during the Class

15

Period, Defendants breached their duties and responsibilities as Silver Fixing Members by, *inter alia*, agreeing to submit false pricing information not reflective of legitimate supply and demand fundamentals during the Silver Fixing to manipulate the price of silver and silver derivatives to artificial levels that benefitted their positions in physical silver and silver derivatives, including COMEX silver futures contracts.

### C. Defendants Used Their Advance Knowledge of the Silver Fixing Results to Establish COMEX Silver Futures Positions During The Silver Fixing Before The Results Were Released to the Public

60.     Defendants unlawfully used their advanced, inside knowledge of the Silver Fixing to establish positions in the silver market, including positions in COMEX silver futures, that would increase in value once the results of the Silver Fixing were released to the public.

61.     In a scheme akin to front running, Defendants, with complete and unaudited control over the results of the Silver Fixing, colluded with each other about where to fix the price of silver, and then either directly or through contact with their trading desks establish positions in the silver market that would financially benefit from where they knew the price of silver was going to be fixed following the public release of the Silver Fixing to the general market.  For example, if Defendants decided that the Fix price was going to be higher than currently reflected in the price of COMEX silver futures contracts, Defendants would establish long COMEX silver futures positions that would increase in value once the Silver Fixing results were released to the public and the price of silver increased.

62.     This manipulative conduct rendered Defendants' COMEX silver futures positions, including those initiated and liquidated in or around the Silver Fixing, an illegitimate part of the supply-demand equation for the prices of all COMEX silver futures contracts.[2]

---

[2] *See Matter of Indiana Farm Bureau Coop. Ass'n, Inc.*, CFTC Dkt. No. 75-14, 1982 WL 30249, at *39 (CFTC Dec. 17, 1982) (explaining that if a price is affected by a factor that is not legitimate, for example, trading that

D. **Defendants Manipulative Conduct Is Confirmed By Plaintiff's Proprietary Economic Analysis**

63.     Using proprietary software, Plaintiff analyzed the price and trading volume of COMEX silver futures contracts during the period of 11:55 A.M. - 12:05 P.M. London time (the "Target Window") for each trading day between January 1, 2007 and December 31, 2010 (the "Analysis Period").  Plaintiff selected this ten minute window because it includes trading activity occurring in or around the commencement of the Silver Fixing, which begins at noon London time, but prior to the publication of the Silver Fixing's results to the general public, which occurs on average between 12:10 – 12:15 P.M. London time.

64.     Plaintiff divided the Target Window into two halves, the five minute period before the start of the Silver Fixing, 11:55 A.M. - 12:00 P.M. London time (the "Pre-Fixing Window"), and the five minute period after the start of the Silver Fixing, 12:00 P.M. – 12:05 PM London time (the "Post-Fixing Window").

65.     Plaintiff compared the slope of the price trend for COMEX silver futures contracts during the Pre-Fixing Window to that during the Post-Fixing Window on days within the Analysis Period where the total trading volume was at least 100 contracts.  Plaintiff screened for days where the slope observed during the Pre-Fixing Window changed direction during the Post-Fixing Window.  Plaintiff then narrowed the results to include only those days where the change in slope was accompanied by an increase in trading volume during the Post-Fixing Window.

---

violates contract market rules or laws, then "the resulting price is necessarily artificial").

66.     The combination of a directional change in slope and increase in trading volume during the Post-Fixing Window is consistent with trading by "informed trades" who know where the price of silver will be fixed.[3]

67.     "Uninformed traders" without advance knowledge of the Silver Fixing results generally wait to see the results of the Silver Fixing before placing additional trades.  This is reflected throughout the Analysis Period by an average 16.4% decrease in trading volume during the 5 minutes prior to the start of the Silver Fixing, when compared to the rest of the day.

68.     Large spikes in trading volume during the Post-Fixing Window, while the Silver Fixing is happening, goes against the observed trend of decreasing volume during 5 minutes prior to the Silver Fixing and indicates trades placed by informed trades with advanced knowledge of the Silver Fixing results.

69.     Plaintiff's analysis uncovered 198 days throughout the Analysis Period where trading in the nearby most active COMEX silver futures contract met the 100 contract daily volume threshold and exhibited a directional change in the slope of the price trend between the Pre-Fixing Window and the Post-Fixing Window.  Each of these 198 days were also marked by an increase in COMEX silver futures contract trading volume during the Post-Fixing Window between 12:00 P.M. and 12:05 P.M. London time.

---

[3] *See Leaky Fixing*, at 32 (explaining that directional changes in price and increases in volume and volatility following the start of the fix "is not just uninformed speculation" but indicative of trading enjoyed by informed traders, *i.e.*, those with directional insight into how the Silver Fixing would turn out).

### FIGURE 2



70.     For example, Figure 2 illustrates the price and volume of the July 2007 COMEX

silver futures contract between 6:55 A.M. and 7:06 A.M. Central Standard Time on May 18,

2007, one of the 198 days identified by Plaintiff's analysis.  This time period coincides with the

Target Window described in ¶63 *supra*.

71.     Figure 2 shows an anomalous spike in trading volume at exactly 7:00 A.M.

Central Standard Time, corresponding to the 12:00 P.M. London time start of the Silver Fixing.

This spike in volume is significant.  On May 18, 2007, the average trade volume for July 2007

COMEX silver futures contracts during the Pre-Fixing Window was 4 contracts per trade.

Immediately at the start of the Silver Fixing the volume in July 2007 COMEX silver futures

contracts spikes to 80 contracts, 20 times the average volume during the previous 5 minutes.

72.     Responding to this spike in volume, the price of July 2007 COMEX silver futures contracts decreases from $12.93 per troy ounce before the start of the Silver Fixing to $12.92 per troy ounce.  The decrease in price suggests that the large trade occurring at 7:00 A.M. in Figure 2 is at least in part a short COMEX silver futures position.

73.     A short COMEX silver futures contract represents an obligation to sell 5,000 troy ounces of silver on the settlement date.  The price of futures contracts, including COMEX silver futures contracts, respond to changes in the supply and demand for the underlying commodity. The initiation of a large short position in July 2007 COMEX silver futures contracts, for example up to 80 contracts as displayed in Figure 2, indicates an agreement to sell a large quantity of silver in the future.  This large future sale represents weakening demand for silver, which is reflected in the market by a decrease in the price of at least the July 2007 COMEX silver futures contract.

74.     As anticipated by the decrease in the price of July 2007 COMEX silver futures contracts observed at 7:00 A.M. Central Standard Time on May 18, 2007, the Silver Fixing set the price of silver at $12.87 per troy ounce, 6 cents per troy ounce lower than at the start of the Silver Fixing.

75.     It is not a coincidence that the large sale of July 2007 COMEX silver futures contracts observed on May 18, 2007, which caused a decrease in the overall price of July 2007 COMEX silver futures contracts, was followed by a Fix that set the price of silver lower than it had been at the start of the Silver Fixing.  Throughout the Analysis Period, changes in the price trend for COMEX silver futures occurring between the Pre-Fixing Window and Post-Fixing

Window correctly predicted where the Fix would be relative to the price of silver at the start of the Silver Fixing 72% of the time.[4]

76.     This predictive power indicates that the trades being placed during the Post-Fixing window, which impact the price trend in at least the nearby COMEX silver futures contract, are placed by informed traders who know the outcome of the Silver Fixing before it is released to the general public.  Trades made by informed traders, like the large short position initiated at 7:00 A.M. Central Standard Time on May 18, 2007, are specifically designed to (and did) benefit from the eventual outcome of the Silver Fixing.

77.     The predictive relationship between COMEX silver futures trades placed during the Post-Fixing Window and the results of the Silver Fixing continued throughout the entire Analysis Period.

---

[4] Similar predictive power was observed for the results of the Gold Fixing. *See Leaky Fixing* at 35 ("[N]ot only are the price movements of publicly-traded instruments predictive of the fixing price direction, they are significantly more predictive for the fixings that result in larger price changes.  That is, not only are the trades quite accurate in predicting the fixing direction, the more money that is made by way of a larger price change, the more accurate the trade becomes.  This is highly suggestive of information leaking from the fixing to these public markets.").

**FIGURE 3**



78.    Figure 3 (above) illustrates the price and volume of the July 2008 COMEX silver futures contract between 6:55 A.M. and 7:06 A.M. Central Standard Time on May 14, 2008, another one of the 198 days identified by Plaintiff's analysis.  The time period displayed in Figure 3 coincides with the Target Window described in ¶63 *supra*.

79.    Figure 3 shows an anomalous volume spike at 7:04 A.M. Central Standard Time, four minutes after the Silver Fixing started at 12:00 P.M. London Time.  This volume spike is significant.  During the Pre-Fixing Window, the average trade volume for the July 2008 COMEX silver futures contract was 2 contracts per trade.  The trade occurring at 7:04 A.M. in Figure 3 is for 16 July 2008 COMEX silver futures contract, 8 times greater than the average trade volume during the Pre-Fixing Window.

80.     Following this trade, the price of July 2008 COMEX silver futures contracts ticks downward one cent from around $16.835 at 7:04 A.M. to $16.825 at 7:05 A.M.  This downward price movement, as explained *supra*, suggests that the 16 contracts traded at 7:04 A.M. on May 14, 2008, are most likely a short position that will benefit from a decrease in the price of July 2008 COMEX silver futures contracts.

81.     As predicted by the decrease in the price of July 2008 COMEX silver futures contracts observed at 7:04 A.M. on May 14, 2008, the Silver Fixing set the price of silver at $16.69 per troy ounce, almost 12 cents per troy ounce lower than at the start of the Silver Fixing.

82.     While the examples in Figures 2 and 3 both involve predictive decreases in the price of silver relative to the price before the Silver Fixing, trades made during the Post-Fixing window also correctly predicted the results of the Silver Fixing when the results were higher than the price of silver prior to the start of the Silver Fixing

**FIGURE 4**



83.     Figure 4 (above) illustrates the price and volume for the September 2009 COMEX silver futures contract on July 28, 2009, between 6:55 A.M. and 7:06 A.M, one of the 198 days identified by Plaintiff's analysis.  The time period displayed in Figure 4 coincides with the Target Window described in ¶63 *supra*.

84.     Figure 4 shows an anomalous volume spike just before 7:04 A.M., less than four minutes after the start of the Silver Fixing.  This volume spike is significant.  During both the Pre-Fixing Window and the Post-Fixing Window (which includes the anomalous volume spike), the average trade volume for September 2009 COMEX silver futures contracts was just 2 contracts per trade.  The trade that occurs just before 7:04 A.M. is for 8 September 2009

COMEX silver futures contracts, four times the average trade volume during the Pre-Fixing

Window and the Post-Fixing Window.

85.     In response to this trade, the price of September 2009 COMEX silver futures

contracts jumps five cents per troy ounce from $13.95 per troy ounce to $14.00 per troy ounce.

This price increase is indicative of the initiation of a long COMEX silver futures position.  Each

long COMEX silver futures contract represents and agreement buy 5,000 troy ounces of silver in

the future.  An agreement to buy a large quantity of silver, for example 40,000 troy ounces or 8

contracts worth, signifies strengthening demand for silver consistent with the observed increase

in the price of September 2009 COMEX silver futures contracts.

86.     As predicted by the price increase observed in Figure 4 at 7:04 A.M., on July 28,

2009, the Silver Fixing set the price of silver at $14.02 per troy ounce, four cents per troy ounce

higher than at the start of the Silver Fixing, and seven cents per troy ounce higher than when the

long position in September 2009 COMEX silver futures contracts was initiated just prior to 7:04

A.M.

## FIGURE 5



87.      In another example of a downward manipulation of COMEX silver futures prices,

Figure 5 (above) displays the price and volume of the December 2010 COMEX silver futures

contract between 5:55 A.M. and 6:06 A.M. on November 15, 2010, one of the 198 days

identified by Plaintiff's analysis.  The time period reflected in Figure 5 coincides with the Target

Window described in ¶63 *supra*.

88.      Figure 5 shows an anomalous spike in volume occurring at 6:00 A.M. Central

Standard Time, coincident with the start of the Silver Fixing at noon London Time.  This volume

spike is significant.  During the Pre-Fixing Window, the average trade volume for December

2010 COMEX silver futures contracts was one contract per trade.  The trade at 6:00 A.M. is for

10 December 2010 COMEX silver futures contracts, 10 times the average trade volume during the previous five minutes.

89.     Following this large trade at 6:00 A.M. the price of December 2010 COMEX silver contracts declines from $26.10 per troy ounce to $26.025 per troy ounce, a drop of almost 8 cents per troy ounce.  This large tick downward suggests that the 10 December 2010 COMEX silver futures contracts traded at 6:00 A.M. represent the initiation of a short position, which will benefit from a decrease in the price of silver.

90.     As predicted by the downtick following the large volume spike displayed in Figure 5, on November 15, 2010, the Silver Fixing set the price of silver at $26.01, 9 cents lower than the price of December 2010 COMEX silver futures contracts at the start of the Silver Fixing.

91.     The examples above demonstrate how Defendants use their positon of trust as Silver Fixing Members to trade in advance of the public release of the Fix results and establish illegitimate positions that financially benefit from the direct impact the Silver Fixing has on the price of COMEX silver futures contracts.

92.     When the Defendants know the Silver Fixing is going to be lower than the-then price of the nearby COMEX silver futures contracts, as demonstrated in Figures 2, 3, and 5, they establish short positions that increase in value with the downward change in price trend that occurs once the Silver Fixing results are released to the public.

93.     When the Defendants know the Silver Fixing is going to be higher than the price of nearby COMEX silver futures contracts price, as demonstrated in Figure 4, they establish long positions that benefit from the upward trend in the price of COMEX silver futures contracts that occurs in response to the release of the Silver Fixing results.



FIGURE 6

Dec. 10 COMEX Silver Futures Contract Price vs. Silver Fixing - 11/15/2010

94.     Figure 6 (above) shows the price of the December 2010 COMEX silver futures contracts throughout the entire day on November 15, 2010.  The time of the Silver Fixing is indicated by the vertical dotted line at 6:00 A.M. CST.  The price of silver set by the Silver Fixing is indicated by the dotted line extending horizontally across the entire chart.

95.     November 15, 2010 is significant because, as demonstrated in Figure 5, on that day trading activity during the Post-Fixing Window correctly predicted that the Silver Fixing would set the price of silver lower than it had been prior to the start of the Silver Fixing.

96.     Consistent with the lower Silver Fixing, the price of December 2010 COMEX silver futures contracts continued to decline throughout the day after a brief rally between 9:00 A.M. and 10:00 A.M. Central Standard Time.  At the lowest point of the day, December 2010 COMEX silver futures contracts traded at $25.40 per troy ounce, down 70 cents per troy ounce from the start of the Silver Fixing.  The December 2010 COMEX silver futures contract finished November 15, 2010, at $25.70 per troy ounce, down at total of 40 cents per troy ounce from the start of the Silver Fixing.

97.     As demonstrated by Figure 6, the Silver Fixing not only impacts the price of COMEX silver futures contracts within the minutes after the Silver Fixing but causes a continuing artificial price trend.

98.     Defendants, by establishing positions during the Post-Fixing Window, before the results of the Silver Fixing are released to the market, benefit not only from the immediate short term moves in the price of physical silver and silver-based derivatives, like COMEX silver futures contracts, that occur when the Fix is made public, but also from longer term price artificiality.

29

### III.   THE STRUCTURE OF THE SILVER FIXING LENDS ITSELF TO SUCCESSFUL MANIPULATION AND COLLUSION

99.   **Barriers to Entry**. The nature of the Silver Fixing process permits an environment that is susceptible to collusion.  Additionally, because there are only three fixing members that participate in the Silver Fixing process, the structure of the Silver Fixing process was oligopolistic, making collusion a rational business strategy to increase the Silver Fixing Members' profits to the detriment of those counterparties that could not participate in Silver Fixing.

100.   **High Number of Inter-firm Communications That Involve the Exchange of Proprietary and Market Information**.  Each business day, Defendants engaged in the Silver Fixing Process through teleconference.  At the teleconference, Defendants exchanged market information concerning the spot price of silver to arrive at an agreed upon spot price for silver.

101.   **Ongoing Government Scrutiny and Investigations**.  The U.S. Commodity Futures Trading Commission, the U.K. Financial Conduct Authority and the German Federal Financial Supervisory Authority or BaFin are investigating the Silver Fixing and how prices are set in the silver market.

102.   **The End of the Silver Fixing Following Regulatory Investigations and Scrutiny**.  Amid regulatory scrutiny of the Silver Fixing, Defendant Deutsche announced it was withdrawing from the Silver Fixing panel.  And the London Silver Market Fixing Ltd., the entity that administers the Silver Fixing, announced on May 14, 2014 that the Silver Fixing will end on August 14, 2014.

### CLASS ACTION ALLEGATIONS

Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his

own behalf and as a representative of the following Class:[5]

> All persons or entities who transacted in COMEX silver futures contracts during the period of at least January 1, 2007 through the present (the "Class Period"). Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, employee, agent or co-conspirator of any Defendant.

103.    The Class is so numerous that the individual joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

Plaintiff is informed and believes that at least thousands of geographically dispersed Class

members transacted in silver futures contracts during the Class Period.

104.    Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as complained of herein.  The injuries and damages of each

member of the Class were directly caused by Defendants' wrongful conduct in violation of the

laws as alleged herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the

Class.  Plaintiff is an adequate representative of the Class and has no interest, which is adverse to

the interests of absent Class members.  Plaintiff has retained counsel competent and experienced

in class action litigation, including commodity futures manipulation and antitrust class action

litigation.

106.    Common questions of law and fact exist as to all members of the Class, which

predominate over any questions affecting solely individual members of the Class.  These

common questions of law and facts include, without limitation:

---

[5] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

(a) Whether Defendants manipulated silver futures contracts in violation of the CEA;

(b) Whether such manipulation caused silver futures contracts to be artificial;

(c) Whether such manipulation caused cognizable legal injury under the CEA;

(d) Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

(e) Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

(f) The operative time period and extent of Defendants' foregoing violations; and

(g) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

107.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

108.   Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

109.   The statute of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by

Defendants and Defendants' inherently self-concealing conduct. Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence prior to the time Deutsche announced its withdrawal from Silver Fixing in January 2014. Plaintiff thus asserts the tolling of the applicable statute of limitations affecting the rights of the claims of relief asserted by Plaintiff. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

110.   Active acts of concealment by Defendants to conceal their violations of law from Plaintiff and the Class include, *inter alia*, avoiding discussing the manipulation of the Silver Fixing in public forums.

111.   Defendants' active acts of concealment were also inherently self-concealing. Defendants' manipulation of the Silver Fixing required that it remain concealed from regulators and the public in order to insure its success over an extended period of time.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*)**

**Against All Defendants**

112.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

113.   Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices in silver and silver derivatives, including COMEX silver futures contracts in violation of the CEA, 7 U.S.C. § 1, *et seq.*

114.     Each Defendant individually had and all Defendants collectively had the ability to cause and did cause artificial prices.

115.     The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") amended Section 6(c)(1) to the CEA.  Under Section 6(c)(1), codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commodity Futures Trading Commission ("CFTC"), shall promulgate not later than one year after July 21, 2010, the date of enactment of Dodd-Frank.

116.     The CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a), in July 2011.

117.     Defendants also violated CFTC Rule 180.1(a), by *inter alia*, trading silver and silver derivatives, including COMEX silver futures, based on non-public inside information obtained and used by them in breach of their duty as Silver Fixing Members.  Defendants, as sophisticated market participants responsible for the setting of global silver prices, had a duty to set prices reflective of legitimate supply and demand fundamentals, and not cause, exacerbate or further any manipulation of silver or silver futures prices.  Instead, Defendants abused their position of trust and breached their duties and responsibilities as Silver Fixing Members to cause a specifically plead price artificiality in silver and silver futures prices.  These acts rendered Defendants' pre-arranged execution of COMEX silver futures positions before and around the Silver Fixing an illegitimate part of the supply-demand equation for the prices of COMEX silver futures contracts.

118.     As a direct result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered actual damages and injury in fact due to artificial COMEX silver futures contract prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein.  Plaintiff and members of the Class were further legally injured and suffered injury in fact that they transacted in silver derivatives, including COMEX silver futures contracts, in an artificial and manipulated market operating under the artificial prices caused by the Defendants.  Defendants' conduct is presumed to have caused injury to the Plaintiff and the Class.

119.     Plaintiff and members of the Class who purchased or sold silver derivatives, including COMEX silver futures contracts, during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

### (For Principal-Agent Liability In Violation of The Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*)

### Against All Defendants

120.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

121.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

122.     Plaintiff and members of the Class are each entitled to actual damages sustained in silver derivatives, including COMEX silver futures contracts, for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

**(For Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*)**

**Against All Defendants**

123.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

124.    The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein.  Each Defendant did so knowing of other Defendants' manipulation of the Silver Fix, and COMEX silver futures contracts, and substantially and willfully intended to assist these manipulations to cause the prices of COMEX silver futures contract prices to be artificial during the Class Period, in violation of §22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

125.    Under §13(c)(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

126.    Other persons willfully intended to assist these manipulations to cause the price of COMEX silver futures contracts to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).  They are the agents and unnamed co-conspirators as alleged herein.

127.    Plaintiff and members of the Class are each entitled to actual damages sustained in COMEX silver futures contracts for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

**(For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*)**

**Against All Defendants**

128.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

129.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

130.    During the Class Period, Defendants controlled the Silver Fixing and therefore controlled the price of silver, including the prices of silver derivatives and COMEX silver futures contracts.  Defendants competed in these markets.

131.    The combination and conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial the Silver Fixing and the price of silver and silver derivatives, including silver futures contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

132.    Defendants' conspiracy and resulting impact on the Silver Fixing and the prices of silver and silver derivatives, including silver futures contracts occurred in or affected U.S. interstate commerce.

133.    As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.  Without limiting the generality of the foregoing, Plaintiff and members of the Class paid artificial and non-competitive prices for silver futures contracts as a proximate result of Defendants' anticompetitive conduct.  Plaintiff and the other members of the Class were also deprived of the benefits of free and open competition in transacting silver futures contracts.

134.    Plaintiff and members of the Class are each entitled to treble damages for the

Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining

Defendants from engaging in additional anticompetitive conduct.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and

(b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class

representative, and his counsel be appointed as Class counsel;

B.    For a judgment awarding Plaintiff and the Class damages against Defendants for

their violations of the CEA, together with prejudgment interest at the maximum rate allowable

by law;

C.    For the unlawful conduct alleged herein to be adjudged and decreed to be an

unlawful restraint of trade in violation of Section 1 of the Sherman Act;

D.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees

and the respective officers, directors, partners, agents, and employees and all other persons

acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing

and maintaining the conspiracy alleged in the Complaint;

E.    For a judgment awarding Plaintiff and the Class damages against Defendants for

their violations of the federal antitrust laws, in an amount to be trebled in accordance with such

laws;

F.    For an award to Plaintiff and the Class of their costs of suit, including reasonable

attorneys' and experts' fees and expenses; and

G.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully

demands a trial by jury of all issues so triable.

Dated:  White Plains, New York
        July 24, 2014

LOWEY DANNENBERG COHEN
& HART, P.C.

By: _____
Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip
Raymond Girnys
Christian Levis
One North Broadway
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com
clevis@lowey.com

*Counsel for Plaintiff and the Proposed
Class*